## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

TARYN GILBERT HOWARD, Ph.D.,    )
        )
        Plaintiff,    )
        )
v.        )    Case No. 5:24-CV-4050
        )
KANSAS WESLEYAN UNIVERSITY,    )
        )
        Defendant.    )
        )

## **COMPLAINT**

Plaintiff Taryn Gilbert Howard, Ph.D., through counsel Sean McGivern of Graybill & Hazlewood, LLC, states and alleges as follows for her cause of action against Defendant Kansas Wesleyan University:

1.    Plaintiff Taryn Gilbert Howard, Ph.D., is a citizen of the state of Kansas.

2.    Defendant Kansas Wesleyan University ("KWU"), a Kansas corporation, is a university with its principal place of business at 100 Claflin Avenue, Salina, KS 67401.

3.    Subject matter jurisdiction is established under 28 U.S.C. § 1331 as Dr. Howard seeks redress under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681 et seq.

4.    Personal jurisdiction and venue are proper in this Court because KWU's acts and omissions complained of occurred in this Judicial District.

5.    On March 19, 2020, prior to being offered the Assistant Professor of English position, Dr. Howard spoke to Dr. Matt Thompson, KWU President, as part of the formal interview process. In that interview, they talked about the university's initiatives related to diversity, equity,

and inclusion (DEI). Dr. Howard talked about her own interest in supporting these endeavors through her scholarship and potential work at the university. Dr. Howard also noted that although the student population at KWU was racially diverse, the current KWU university faculty and administration were predominately white. Dr. Howard insisted that she would help support diversity initiatives if she was given the position, but Dr. Howard specifically told Dr. Thompson that if she was in competition with a faculty member of color, the university should take into consideration how much an additional faculty of color would help the KWU campus be more reflective of their diverse student population.

6.      Dr. Howard began employment with KWU in August 2020 as an Assistant Professor of English.

7.      On October 5, 2020, Dr. Howard sent Dr. Thompson an email entitled "Diversity Statement" to thank him for "pushing faculty, [herself] included, to continue to work and take action to make change [regarding diversity initiatives on campus]." Dr. Thompson responded via email thanking Dr. Howard and asked Dr. Howard for "insights on how we get this conversation moving with faculty [as] it will only advance if other faculty members speak up and push their colleagues to engage in meaningful discussions about how to enhance our formal and informal curricula [about diversity]."

8.      On November 16, 2020, Dr. Allen Smith, Director of Diversity, Equity, and Inclusion, sent Dr. Howard an email thanking her for her work on the Diversity, Equity, and Inclusion committee and wrote the following about her action and participation within that committee: "I need that strong white voice!!"

9.      In her Year 1 Peer Review on February 25, 2021, Dr. Howard received glowing reviews from her faculty peers, Dr. Phillip S. Meckley and Dr. Melissa Rohrer, and the Provost,

Dr. Damon Kraft. Dr. Kraft specifically noted Dr. Howard's "strong collaboration with her departmental colleagues" as well as her work on the DEI Committee and Women's History Month Committee, personally "applaud[ing] Dr. Gilbert Howard for proactively seeking to be involved in campus service during her first year when such efforts are not mandatory." One of Dr. Kraft's "biggest recommendations for [Dr. Howard's] future growth" was to "continue the work that she is doing related to DEI [diversity, equity, and inclusion]."

10.     In May 2021, at the end of her first year of teaching, Dr. Howard was nominated and elected by her faculty peers to the Faculty Affairs Committee for a two-year term. She was the most junior member of this committee and the only non-tenured member of this committee.

11.     On May 17, 2021, Dr. Thompson discussed the Faculty Morale Survey for the 2020-2021 school year at the end of the year Faculty Meeting. In Dr. Thompson's Power Point presentation regarding this survey, he noted that "several faculty members voices a concern that women of the faculty have felt that they were 'talked over' or 'mansplained to' during conversations with Administration... we believe we can all do better, Damon [Kraft], Bill [Backlin], and Matt [Thompson] are committed to professional development on this topic...we will work with FAC [Faculty Affairs Committee] and directly with faculty to hear examples of when this has/does occur to enhance a collegial and inclusive conversation."

12.     Immediately following the May 17, 2021 Faculty Meeting, Dr. Thompson approached Dr. Howard and asked her about the feedback regarding the sexist behavior of administrators noted in the survey. Dr. Thompson asked if Dr. Howard had heard anything about this feedback or had personally experienced any kind of sexist treatment during her first year at the university. Though Dr. Howard felt uncomfortable being put on the spot, Dr. Howard truthfully shared that she had heard this type of feedback from numerous female faculty during her first year.

Dr. Thompson then asked her if she thought the feedback had been about Dr. Kraft specifically. Despite the sensitivity of the subject, Dr. Howard said yes, she had heard this about Dr. Kraft specifically and had personally experienced this kind of treatment by Dr. Kraft. Dr. Howard also told Dr. Thompson that she had also heard this feedback about other male administrators as she was uncomfortable directly telling him she had heard this type of feedback about him as well. While it was difficult, Dr. Howard believed she had done the appropriate thing by reporting discriminatory behavior to Dr. Thompson.  Following this comment, Dr. Thompson asked Dr. Howard if she could recommend any readings for the administrators. She assumed he was joking, and asked him the following question: "You want me to recommend readings to help make the administration less sexist?" When she realized Dr. Thompson was being serious, Dr. Howard awkwardly laughed and said that she wasn't sure how much a reading would help someone unlearn sexist behaviors.  Dr. Howard said she couldn't come up with any readings off the top of her head, but that she might be able to recommend some feminist literary criticism if he gave her a better idea of what he was looking for.

13.     Neither Dr. Thompson, nor anyone from administration, ever followed up with the Faculty Affairs Committee or the faculty at large about the issues raised by Dr. Thompson at the May 17, 2021 meeting.

14.     Also in May 2021, Dr. Howard was named to a faculty leadership group by her fellow faculty peers (with a top number of votes, according to the veteran faculty member forming the group). This group was formed based on the following question: name 2-3 individuals that you view as representing the "heart and soul of Kansas Wesleyan." Dr. Howard was the most junior faculty member on campus at the time, yet she was appointed to this peer selected faculty

leadership group. She was made aware of this honor in September 2021 at the start of her second year of working at KWU.

15.     On October 11, 2021, the administration proposed a voting change at the Faculty Meeting to the faculty handbook without consulting the faculty at large. In their proposal, the administration wanted to add more individuals who would have voting rights during Faculty Meetings. For example, the proposal would have provided voting rights to the following individuals: Director of Diversity and Student Success, Director of the Student Success Center, Chair of the Department of Business, and Director of Graduate Education and Instructional Technology. The faculty in attendance shared concerns and criticisms that the administration's proposal could sway voting by having adding four more "administrative" voting positions. Faculty were also concerned these new positions did not undergo peer review and/or have teaching as their main priority, yet they would be voting on these issues. The faculty flatly rejected the administration's proposal and voted to send the proposal to the Faculty Affairs Committee for conversation and revision before another vote and eventual handbook revision.

16.     Dr. Howard was elected to the Diversity, Equity, and Inclusion Committee by her peers at the November 8, 2021 Faculty Meeting. Dr. Howard received more votes to serve on this committee than a more senior faculty member.

17.     On December 15, 2021, the Faculty Affairs Committee (Dr. John Burchill, Dr. Kristin Kraemer, Professor Kathy Sweeny and Dr. Taryn Gilbert Howard) hosted a faculty conversation about shared governance to come up with a new faculty voting definition and voting list. Before the meeting, a survey was sent out to teaching faculty to gather feedback regarding shared governance and broad institutional concerns. Thirty-three faculty members replied to the survey. All the feedback and definitions provided by faculty were anonymous, but they were

shared with faculty as well as Dr. Thompson and Dr. Kraft who were both in attendance. Much of this anonymous feedback was critical of shared governance practices on campus as well as critical of administration, specifically the President and Provost. For example, one faculty respondent said, "Administration has broken trust with faculty." Another respondent said, shared governance is "a term to make faculty 'feel' like they have a say, but in reality, upper administration & the board will make the decisions." Another faculty respondent said, "more faculty must be willing to hold important positions (and not be punished for being tough and doing a hard job)." Another faculty respondent said, "It feels too much like the President and Provost have to 'win' or have to be right, which won't allow anyone to grow or bring about better shared governance." Another respondent said, "the administration, specifically the President and Provost, must stop taking it personal when the faculty disagrees with them or acting like the faculty are not 'team players'...the president should stop assuming that his subtitle 'CEO' means 'unilateral authority.'"

18.     Despite the meeting lasting almost two hours, Dr. Thompson and Dr. Kraft abruptly left within 30 to 40 minutes. At the end of this meeting, the faculty, with the help of the Faculty Affairs Committee, started to form a new voting membership proposal, including a rationale/definition and new voting list.

19.     Following winter break, the Faculty Affairs Committee led a follow-up teaching faculty meeting on January 31, 2022 to continue discussing shared governance and voting membership. The majority of the faculty attended at least one of the meetings to discuss shared governance and voting, and Faculty Affairs offered multiple meeting times and locations to ensure all faculty who wanted to attend could attend. It was clear that many faculty were interested in a much narrower voting list than the administration or the KWU Board of Trustees wanted, and the Faculty Affairs Committee emphasized to faculty that their proposed voting list should not be too

narrow or the KWU Board of Trustees would refuse to approve it. Ultimately, all decisions for major changes at the university had to go through the Board of Trustees, which is made up of past KWU alumni and individuals from the community. At the end of this meeting, the faculty created a voting membership proposal to counter the administration's previously rejected proposal.

20.     The proposal from the Faculty Affairs Committee, written in conjunction with the faculty, utilized the American Association of University Professors (AAUP) definition of who faculty are and decided that voting membership should "consist of members who are responsible for developing and implementing curriculum and assessment within their academic programs." The new voting list included two of the four individuals that the administration had originally wanted added and removed the librarian from the list. Though the faculty seemed to want a more narrowed list, they agreed to move forward for the sake of compromise. This proposal would be shared with the administration, and then voted on at the February 2022 Faculty Meeting.

21.     On February 7, 2022, the Faculty Affairs Committee met with Dr. Thompson and Dr. Kraft to discuss the teaching faculty voting proposal prior to the full faculty vote at the February Faculty Meeting. Dr. Thompson and Dr. Kraft said they did not support the teaching faculty's proposal and said the faculty were, collectively, "on our own" with the full faculty vote and the Board of Trustees Academic Affairs Committee meeting. The BOT Academic Affairs Committee was a smaller group of board members that acted as an advisory group on academic decisions before amendments and changes made it to the full board for a vote and implementation into the Faculty Handbook. Despite the broad faculty support for the new proposal, Dr. Thompson and Dr. Kraft specifically raised the concern that the librarian, Megan Mack, and Director of the Student Success Center, Bryan McCullar, would lack voting rights under this proposal.

22.     In this meeting, Dr. Thompson and Dr. Kraft also fixated on rumors that faculty were supposedly spreading about administrators—like discussing the state of Dr. Thompson's marriage and the mental and behavioral instability of specific administrators. Dr. Thompson also said faculty wasted their time addressing the fragile mental health of faculty in the upcoming faculty letter to the Board of Trustees. This letter was drafted by the Faculty Affairs Committee based on feedback from the teaching faculty regarding the state of the university, highlighting both strengths and areas of improvement for the university.  These letters are written three times a year before the KWU board meets, and Dr. Thompson was criticizing the amount of space utilized to discuss the mental health struggles of faculty at KWU as he seemed frustrated that the faculty would be sharing unflattering aspects of the university with the board. All Faculty Affairs Committee members in this meeting were frustrated by Dr. Thompson's comment about faculty mental health. Dr. Howard told Dr. Thompson (in front of the group) that she was extremely disturbed and disgusted that he would make that comment so callously. Dr. Howard was deeply troubled that Dr. Thompson seemed unconcerned with the struggles faculty were having individually and as a collective regarding overwork and mental health.

23.     On February 10, 2022, the Faculty Affairs Committee met to debrief about their meeting with administration and make plans for the upcoming faculty vote regarding the new proposal written by faculty. As a group, the Faculty Affairs Committee decided they would contact Megan Mack, the librarian, and Bryan McCullar, the Director of the Student Success Center, for feedback on the new proposal prior to the faculty vote. On the committee's behalf, Dr. Howard agreed to meet with Bryan McCullar and Megan Mack individually. She walked over to talk to them immediately after the Faculty Affairs Committee meeting. Both individuals told Dr. Howard they were fine with not voting in faculty matters and did not share concerns with Dr. Howard about

not having a vote. During Dr. Howard's discussion with Megan Mack, Megan Mack said she felt like the librarian supported curriculum rather than being an individual who implemented or assessed curriculum. Upon exiting the library, Dr. Howard ran into Dr. Kristin Kraemer, a fellow member of the Faculty Affairs Committee, and shared the details of her conversations with Dr. Kraemer. Dr. Howard eventually relayed the conversations to the faculty, which is on record in the Faculty Meeting minutes from February 14, 2022.

24.     On February 14, 2022, there was a vote regarding the faculty voting proposal during the monthly Faculty Meeting. During this meeting, steps to reach the new definition were shared and reviewed with faculty in attendance, and a discussion took place between the faculty and administration before the vote. The Faculty Affairs Committee, specifically Dr. Howard and Dr. Kraemer, led this discussion. During this meeting, Dr. Howard relayed the comment made by Megan Mack about being a supporter of curriculum. A request was made for the vote to take place through a secret ballot vote. The new definition and voting list proposal resoundingly passed with a 38-6 vote.

25.     On February 18, 2022, Dr. Kraemer presented the faculty voting proposal to the Board of Trustees Academic Affairs Committee so the vote could go to the full board for approval into the Faculty Handbook. Dr. Kraemer served as the faculty representative on this committee and her role on the Faculty Affairs Committee made her more knowledgeable than most about the voting proposal process. Prior to the meeting, Dr. Kraemer was asked by the chair of the Board of Trustees Academic Affairs Committee, Jerry Norton, to prepare a Power Point Presentation to help the committee understand the faculty's process and final vote.

26.     In this meeting, Dr. Kraemer was asked to "present the faculty proposal" with the help of her Power Point presentation. In her personal notes that reflected on the meeting, Dr.

Kraemer writes that after she shared the faculty rationale, proposal, and vote, Dr. Kraft was "respectful" as he presented the administration's proposal. However, once this was completed, Dr. Kraemer wrote the following: she [Dr. Kraemer] was "attacked on data from last year report"; "Bill [Backlin] announced we [the Faculty Affair's Committee] never talked to librarian $\rightarrow$ not true—Taryn talked to her [Megan Mack] and she was ok w/ change. She [Dr. Howard] is still being attacked"; "Matt [Thompson] accused faculty of not knowing what they were voting, faculty not participating—turnout was really good, not involving admin—they left halfway or less through meeting with faculty"; " that [Dr. Kraemer] got grilled by [committee member] Randall St. Clair; and that "[I (Dr. Kraemer)] was in tears almost entire meeting."

27.    In her personal notes, Dr. Kraemer also wrote about the power imbalance during this meeting, and Dr. Kraemer emphasized that she was "very concerned that Taryn [Howard] is being demonized for her part in Faculty Affairs—admin seems to be after her."

28.    Based on these exchanges, and the overwhelmingly negative tone by administrators, the members of the Board of Trustees Academic Affairs Committee rejected the approved faculty proposal and sent the definition back for further discussion.

29.    The following day, February 19, 2022, Dr. Eileen St. John, the director of Teacher Education, sent an email to Dr. Burchill, the chair of the Faculty Affairs Committee, which he forwarded to the Faculty Affairs Committee. The email read as follows: "I heard some disturbing news that the BOT letter that was just submitted had additions that we as faculty did not see. In addition, there was a PPT [Power Point Presentation] that was submitted to the BOT with the letter that was not viewed or approved by faculty. I am respectfully asking that you send all faculty the signed letter that was submitted to the Board and the PPT that was sent with it." It was unclear

who Dr. St. John heard this rumor from, as she hadn't spoken to anyone on the Faculty Affairs Committee. Dr. Burchill responded to Dr. St. John that her information was incorrect.

30.     On February 21, 2022, the Presiding Officer of the faculty (a position that worked closely with the Faculty Affairs Committee and led Faculty Meetings), sent an email to Dr. Kraft, Dr. Thompson, and Dr. Burchill regarding the BOT Academic Affairs Committee meeting and cc'd the rest of the committee. In this email, the Presiding Officer said the following: "I was disappointed because 1) there are people who should be able to vote at Faculty Meeting that are now denied doing so for the remainder of the academic year, and 2) Board members should not be put in the position of mediating conflict between faculty and administration. I have not liked these sorts of conflicts at Board committees when they have happened in the past, and resent it more today because this time it was three [Dr. Kraft, Dr. Thompson, and Dr. Backlin] versus one [Dr. Kraemer]. The tone of the meeting was apparent from looking through the window for 30 seconds. I'm glad that Dr. Kraemer is tenured and has a thick skin, but things should not have gone down that way and in the spirit of collegial governance we must figure out how to do things differently. KWU deserves better."

31.     Dr. Thompson responded to the Presiding Officer's email by saying "the conversation on Friday was professional," even though Dr. Kraemer was in tears through much of the meeting and multiple faculty members had issued concerns about administration's treatment of her during that meeting.

32.     On February 22, 2022, Dr. Backlin and Dr. Kraft met with the librarian, Megan Mack, to discuss Dr. Howard and the voting proposal that was voted on the previous week.

33.     On February 23, 2022 at 7:55 a.m., Dr. Backlin sent an email to Megan Mack that said the following: "I am sorry to bring this up again, but last evening, we received an email

regarding the faculty vote about 'faculty membership' and this statement was made about you: 'I also heard from Taryn prior to the faculty vote when I asked about whether Megan was ok with the proposed change that Megan was and had been involved in writing the text of the Handbook Change language that was voted on by Faculty.' I need to ask you whether you were involved in writing the text of the proposed Handbook Change language regarding the faculty membership proposal. Is this factual? You are not in trouble, simply wanting to know if the highlighted section is true or not. Please let me know as soon as you are able."

34.    On February 23, 2022 at 9:52 a.m., Megan Mack responded to Dr. Backlin's email: "All that happened was Taryn came to my office (I believe she spoke to Bryan as well) wanting to discuss the proposed changes and if I knew that they impacted me and how I felt about that. I think I remember her writing down or emphasizing my remark about the librarian being a support to curriculum as we had also discussed my presence on the curriculum committee. Whether she used words I said, or Bryan said to write the handbook change, I have no idea? I thought it was just a heads-up as she asked me when the last meeting that I had been to...which means...again I assume...that she didn't know whether I'd been made aware of the decision surrounding the vote. And yes...at the time I wasn't overly concerned because all of my experiences in faculty meetings had led me to believe that the meetings were largely about faculty discussing and making changes to the faculty handbook and that has little to do with me. It had not occurred to me that faculty already have a committee that is just for them and that the library director makes important contributions to these meetings when the discussion turns toward shaping and enhancing curriculum. The conversation I had with her was very much like the conversation I had with you and Damon yesterday. We sat down...she asked me my thoughts...then she left. If that is considered helping to write the text change, then yes I did."

35.     The full faculty voted to approve the revised voting definition and list with a 38-6 vote on Monday, February 14, 2022. The administration undermined the faculty voting proposal (that overwhelming passed a few days prior) at the Board of Trustees Academic Affair Committee meeting on Friday, February 18, 2022. The chair of the Faculty Affairs Committee received an email from Dr. St. John about rumors she had heard regarding the letter to the BOT as well as Dr. Kraemer's Power Point Presentation on Saturday, February 19, 2022. Dr. Kraft and Dr. Backlin had an in-person meeting with Megan Mack the following Tuesday, February 22, 2022; this meeting took place after the faculty had already voted, and per her own email, Megan Mack suggested the discussion with Dr. Kraft and Dr. Backlin had changed her mind about wanting a vote only after the original vote took place. The follow-up email exchange between Dr. Backlin and Megan Mack about this meeting took place on Wednesday, February 23, 2022.

36.     On Thursday, February 24, 2022, Dr. Howard's Year 2 Peer Review took place. The review lasted 1 hour and 37 minutes.

37.     Dr. Howard received general praise for her efforts at KWU under the four tenets of peer review established in the Faculty Handbook for the first 1 hour and 25 minutes of discussion. As the faculty committee members began to wrap up the Peer Review, Dr. Kraft said he wanted to talk about work environment and collegiality. Dr. Kraft asked Dr. Howard for her view on what made an "effective and collegial work environment," and she pointed out that "she never wanted collegiality to be confused with deference" and that sometimes "collegiality from a female faculty perspective gets confused with congeniality." She further insisted that collegiality is applied differently to women in the following statement: "I think about gender dynamics and power dynamics [at KWU]… I think I am fairly authoritative and outspoken and lively and I always have issues around gender playing a role in that kind of notion. And the way that I have to pay attention

to things differently as a female faculty member than certain things that male faculty members have to pay attention to…"

38.    Dr. Kraft then brought up some "recent feedback [he] received" regarding Dr. Howard's supposed non-collegiality; he said, "I want to make you aware of some feedback that I've received that again sometimes maybe colleagues aren't interpreting some of that in the same way. Uh, for example, what would you say if you learned that a colleague kind of recently described your actions as being deliberately divisive and even with elements of malice in them. What would be your reaction?"

39.    Dr. Howard was shocked by the question and asked if Dr. Kraft's scenario was hypothetical or something that someone had actually said about her. Dr. Kraft refused to identify any specific examples, though he did reference her work as an elected faculty representative on the Faculty Affairs Committee.

40.    Dr. Howard repeatedly emphasized how problematic she found Dr. Kraft statements from a gendered perspective during his line of questioning as she knew not all faculty were being asked about collegiality and because he had not followed the proper channels in the Faculty Handbook for handling such issues.

41.    Dr. Melissa Rohrer, Dr. Howard's immediate supervisor and the English Department Chair, insisted that she had **never** had anyone come to her with concerns about Dr. Howard's supposed non-collegiality, but that she'd had multiple faculty members come to her wishing that "Dr. Howard would be more careful because of these very things [i.e. Dr. Kraft suddenly raising vague concerns about Dr. Howard's supposed non-collegiality]" and that Dr. Rohrer "knows many faculty appreciate that you speak out for us." Dr. Rohrer also made clear that

14

none of this had been shared with Dr. Howard by the Faculty Affairs Committee Chair or the Presiding Officer.

42.    Dr. Philip S. Meckley, The Division Chair of Humanities and Teacher Education, said "all the conversations I've had [with other faculty members] noted your articulateness, your outspokenness, and your clarity are all to be commended, and we all [the faculty] thank you."

43.    On February 25, 2022, the three faculty members that comprised the peer review committee submitted a written recommendation that wholeheartedly recommended Dr. Howard receive a contract for the following year in her Year 2 Peer Review letter.

44.    Dr. Howard's Year 2 Peer Review letter from her faculty reviewers, Dr. Philip S. Meckley, Dr. Melissa Rohrer, and Professor Karen Babcock-Brassea, was three pages long, and highlighted Dr. Howard's excellent work at the university. There was not a single reference to "collegiality" or collegiality issues in this letter. The faculty members "commended [Dr. Howard] for her willingness to take prominent leadership positions and be a forceful advocate for the faculty... she has a commitment to diversity and inclusivity in her teaching which is an example for the entire university, and which, in particular, is of great benefit to students...the committee enjoys working with Dr. Howard and values the passionate and articulate advocacy she brings to KWU. We encourage her to maintain leadership roles at Kansas Wesleyan. We value the continuity and collaborative approach she brings to the English Department and the energy she brings to the KWU community."

45.    On March 3, 2022, Dr. Kraft made a written recommendation to non-renew Dr. Howard in her Year 2 Peer Review letter.

46.     Dr. Howard's Year 2 Peer Review letter from Dr. Kraft was three pages long, and most of the letter highlighted and celebrated her work on teaching, advising, service, and professional development. Dr. Kraft said,

> Overall, Dr. Gilbert Howard continues to demonstrate strength in the classroom setting...Dr. Gilbert Howard is serving on several very important committees...[and] overall, Dr. Gilbert Howard has been highly active on Faculty Affairs and the DEI Committee. Her participation in both groups is noted and appreciated. This type of service activity is exactly what an individual on the tenure-track should be doing, and I encourage her to continue to be highly involved.

However, on the last page, Dr. Kraft raised vague concerns about Dr. Howard's supposed "non-collegiality." He provided no examples and instead made many generalizations about Dr. Howard such as alluding to her general "pushy" behavior and said Dr. Howard "approach[es] things with a glass half empty perspective...and has the tendency for a more negative outlook."

47.     On March 14, 2022, Dr. Howard submitted a rejoinder (or rebuttal) to the nonrenewal recommendation to the KWU Divisional Council, comprised of five faculty members. She raised issues with Dr. Kraft's letter of non-renewal, specifically noting misrepresentations, lack of adherence to procedure, gender bias, and retaliation.

48.     On March 17, 2022, the Divisional Council responded to Dr. Howard's rejoinder and **unanimously** recommended that Dr. Howard's contract be continued for the next academic year. The Divisional Council also admonished the Provost, Dr. Kraft, for not following proper procedure in handling "allegations of non-collegial behavior." They insisted that "the complaint should be resolved through proper channels with mediation between the parties facilitated to achieve reconciliation. If such issues arise regarding a faculty member under review, the peer

review should be delayed until the matter is resolved. Any faculty who are reporting concerns or complaints against a colleague to anyone outside of Human Resources should be reminded of the proper procedure for reporting and handling such issues through the established institutional process."

49.    On March 31, 2022, Dr. Thompson sent a letter stating he has reviewed the materials from the peer review committee, the Provost, Dr. Howard's rejoinder, and Divisional Council response; in the letter, he sided with the Provost in choosing to not renew Dr. Howard. Dr. Thompson stated that "while I recognize your success in the classroom, it is outweighed by your approach and style outside of the classroom." Dr. Thompson raised a number of vague allegations of his own about Dr. Howard and stated that "[he] lack[s] confidence in Dr. Howard's ability to perceive or care how she is viewed by others...," and that she has "intentionally misrepresented facts/conversations and worked to be deleterious to our common work instead of being collaborative"; and, generally, that he found Dr. Howard's "style is counterproductive to collegiality and the best interest of the institution."

50.    On information and belief, Dr. Thompson had never overridden a unanimous decision made by the Divisional Council supporting renewal of a faculty member.

51.    To Dr. Howard's knowledge, Dr. Kraft and Dr. Thompson had supported multiple male faculty members be placed on Personal Improvement Plans (PIP) when issues were raised about deficiencies related to classroom/behavior issues.

52.    Dr. Howard never received notice or an opportunity to resolve any such issues.

53.    Prior to the last twelve minutes of her Year 2 Peer Review meeting on February 24, 2022, Dr. Howard had never been counseled, admonished, or disciplined over collegiality.

54.     The KWU Faculty Handbook's own "Collegiality" section (Appendix D: 1.1) states, "faculty members should expect that concerns of another faculty member or administrator would be delivered to them directly, avoiding triangulation—the involvement of third parties prior to being brought to the attention of the member in question."

55.     Dr. Howard never received a formal or informal complaint about her work or professional interactions at the university.

56.     Dr. Melissa Rohrer, the Chair for the Department of English and Dr. Howard's immediate supervisor, never received any informal or formal complaints about Dr. Howard's work or professional interactions.

57.     Dr. Kraft never came to Dr. Howard about concerns regarding her work or professional interactions prior to the last 12 minutes of her Year 2 Peer Review.

58.     Dr. Howard never had a faculty member raise an issue regarding "non-collegiality" with her directly.

59.     Dr. Howard spoke with the Director of Human Resources, Becky Matthews, on March 17, 2022, and Becky Matthews said Human Resources had never been contacted regarding Dr. Howard.

60.     Becky Matthews also told Dr. Howard that KWU Human Resources never investigated anything related to Dr. Howard.

61.     There were no complaints ever placed in Dr. Howard's personnel file, which she last checked on April 4, 2022.

62.     Dr. Howard attempted to grieve the decision to non-renew her employment per the rights outlined to her in the KWU Faculty Handbook.

63.    On April 7, 2022, Dr. Kraft sent an email to Dr. Rohrer, the Chair of the Department of English, that a job ad to replace Dr. Howard's position would be posted online. Dr. Rohrer sent Dr. Kraft an email questioning if a job ad could be posted before the grievance process was complete and questioned why this job search was being rushed when no other active job searches were moving so quickly.

64.    Dr. Howard sent Dr. Kraft an email on April 11, 2022 to initiate the grievance process. Per the handbook, Dr. Howard "should first discuss in an informal manner the grievance with his/her supervisor having the authority to resolve the alleged grievance. This most often will be the Division Chair or the Provost." Dr. Howard sent Dr. Kraft an email as she was grieving the information in his peer review letter, which acted as the catalyst for her non-renewal. In the email, Dr. Kraft responded to Dr. Howard that "in this instance, because it was Dr. Thompson who made the decision not to renew your contract, Dr. Thompson is the only supervisor with the ability to resolve your grievance." Though this did not follow the handbook instructions, Dr. Howard trusted that Dr. Kraft was giving her correct information and proceeded to meet with Dr. Thompson.

65.    Dr. Howard met with Dr. Thompson for an Informal Grievance Meeting on April 12, 2022, per the first step in the grievance process outlined in the Faculty Handbook. In her meeting with Dr. Thompson, Dr. Howard said the following: "I am outspoken. I am a woman. And I am an untenured faculty member. I feel gaslit by such administrative statements [by the President and Provost] regarding perceptions of my collegiality and general likability by faculty, staff, and board members. For the record, I know I am liked by the majority of the faculty and staff colleagues that I interact with on a regular basis...over the last few weeks, many faculty and staff have shared they are outraged by my treatment within this process and disgusted by my firing."

66.    In this same Informal Grievance Meeting, Dr. Howard insisted Dr. Thompson and Dr. Kraft's comments felt personal and biased and that she was being retaliated against for raising concerns about sexism as well as her work on Faculty Affairs, especially considering the administrations' outrage over the faculty vote about voting rights. She also made direct connections to the way male faculty members have been and are being treated differently than female faculty members. Dr. Howard referenced multiple male faculty who were given warnings, put on personal improvement plans, and allowed to keep their jobs despite having had serious issues raised regarding their actions and general collegiality.

67.    At the end of the meeting, Dr. Thompson attempted to undermine the formal grievance process. He insisted, despite resistance from Dr. Howard and Dr. Philip Meckley, that because his decision of non-renewal is being grieved, the normal grievance procedure did not apply. Dr. Thompson refused to acknowledge, per the Faculty Handbook, that if the Grievance Committee determined there was a grievance and a hearing should take place, that this hearing would be the next step. Dr. Howard also informed Dr. Thompson that she believed there was existing grievance precedent and that every faculty member and member of the Faculty Affairs Committee that she had spoken with insisted the hearing would be the step following the determination of a valid grievance. Dr. Howard also suggested Dr. Thompson seemed to be interpreting the handbook to his (and Dr. Kraft's) benefit, rather than following proper procedure.

68.    On April 18, 2022, Dr. Thompson sent a written response to his Informal Grievance Meeting with Dr. Howard and insisted that there "is a clear commitment and track record at the university during [his] tenure in supporting and promoting women... most academic leadership roles are held by women. More than 50% of our faculty are women. The university highlighted female, faculty excellence with the Barabara Marshall and Dorothy Hanna scholarship

competitions. This year's hosting of the inaugural Women in Leadership event. [And] [t]he administration has led and facilitated the DEI efforts including the hiring of an external female faculty trainer."

69.     Also in his written response, Dr. Thompson said "he [has] heard from many trusted individuals and staff leaders who find [Dr. Howard's] approach to be overly forceful, disrespectful, intentionally divisive, and even malicious, and that [Dr. Howard is] not collaborative, and that [she has] worked intentionally to undermine collegial efforts on campus." He further added that her colleagues believe she "behave[s] like a bully" and that Dr. Howard's "outspoken negativity and quashing of other viewpoints has become an issue to address." Dr. Thompson also insisted that he was going to halt the grievance proceeding after Dr. Howard filed her paperwork, because his "logical reading" of the handbook insisted that Dr. Howard wouldn't find "any relief" if they continued to follow procedure.

70.     On April 19, 2022, prior to the submission or completion of Dr. Howard's grievance, Dr. Kraft sends an email to Dr. Rohrer that a job ad to replace Dr. Howard's would be posted shortly. Despite being the chair of the English Department, Dr. Kraft removed Dr. Rohrer as chair of the search committee for Dr. Howard's replacement.

71.     On April 25, 2022, KWU students met with the Student Government Association about Dr. Howard's non-renewal. Before this meeting, many students gathered letters of support and over 300 student signatures (collected in 3 days) supporting Dr. Howard's employment at the university. In the letter submitted on behalf of "The Students at Kansas Wesleyan," the letter says, Dr. Howard "has made a life-long impact on countless students... her teaching style is a fan-favorite that continues to engage students, educate about interesting and difficult topics, and encourage students to think outside the box...**Dr. Howard is a perfect representation of a strong**

**woman** who has had to face adversity and yet remain kind and compassionate." (emphasis added). When presented with these letters and student signatures, Dr. Thompson was dismissive of the students' collective action.

72.    Dr. Howard submitted her formal Grievance Complaint Form on April 25, 2022. Dr. Howard wrote that she believed "there are consistent and repeated issues of gender bias, discrimination, and retaliation in the words and actions of both the President and Provost regarding the non-renewal of [her] contract." She named both Dr. Thompson and Dr. Kraft as individual respondents in this paperwork.

73.    In her formal Grievance Complaint Form, Dr. Howard responded to Dr. Thompson's Informal Grievance letter by saying the following: "Though I recognize these efforts [regarding Dr. Thompson's insistence of gender equality], I don't see them as anything more than what should be expected of a university that engages in equal treatment of the sexes. Statistically, approximately 50% of college professors are female, though the percentage dramatically drops for those that are granted full professorship. I would say that these initiatives may be supported by Dr. Thompson but were brought to life and made possible by numerous faculty and staff members. Furthermore, just because Dr. Thompson treats some women fairly, supports the creation of scholarship competitions in honor of two impressive women faculty members, and facilitated the hiring of external female trainers, doesn't mean he cannot be sexist. The logic that Dr. Thompson presents here is very similar to the type of logic someone hears about issues of racism, homophobia, and sexism, etc. Just because an individual may have a black relative or a black friend doesn't mean they cannot simultaneously be racist to specific individuals. The same thing applies to issues of sexism: Dr. Thompson and Dr. Kraft may treat some women fairly on campus, but that

does not mean there are not specific issues of sexism impacting their behavior and judgement with my termination."

74. On May 12, 2022, the Grievance Committee, comprised of an additional five faculty members, submitted their initial report regarding Dr. Howard's grievance. The report said the committee unanimously agreed that Dr. Howard had a valid grievance around the "arbitrary and capricious nature" of her non-renewal, and the committee concluded a fact-finding hearing must take place to gather additional, necessary information.

75. In their report, the Grievance Committee dismissed Dr. Kraft from Dr. Howard's grievance, because Dr. Kraft informed the committee that Dr. Howard never met with him, so the grievance against him should not move forward, per the rules in the Faculty Handbook. Dr. Howard objected to his removal and responded to the Grievance Committee. Dr. Howard shared her previous email with Dr. Kraft where he told Dr. Howard she should not meet with him and should instead only meet with Dr. Thompson. Dr. Howard suggested that Dr. Kraft intentionally misled her and should be put back into the grievance. Dr. Kraft and Dr. Thompson abused their position of power to their own benefit and misled Dr. Howard to allow themselves to more easily manipulate the grievance process. If Dr. Kraft had not been removed, Dr. Thompson's authoritarian interpretation of the handbook would not have worked.

76. Beginning on May 19th, 2022, Dr. Thompson rejected Dr. Howard's grievance and the committee's request for a grievance hearing.

77. Dr. Howard continued to request a hearing, per the KWU Faculty Handbook, but Dr. Thompson rejects the request for the final time on June 7, 2022.

78. The KWU Board of Trustees affirmed this decision on June 20, 2022, because, in their view, the non-renewal of Dr. Howard employment contract wasn't an adverse action.

79.    KWU treats male faculty more favorably than Dr. Howard.

80.    For example, KWU's Academic Dean, Dr. Backlin, wrote up a nine-page single-spaced non-renewal recommendation regarding a non-tenured male faculty member on October 20, 2021.  The letter was replete with specific examples of deficiencies and misconduct regarding this male faculty member's performance. The letter referenced numerous prior admonishments to this male faculty member in both his Year 1 and Year 2 Peer Reviews. Despite these admonishments, this non-tenured male faculty member was given the opportunity to improve after each review. As this was his Year 4 Peer Review, the male faculty member was granted a substantial amount of time to address alleged inadequacies and performance issues. The Divisional Council recommended that this male faculty member's employment be continued. Dr. Thompson followed the Divisional Council's recommendation and decided to offer the male faculty member an employment contract for the following year, even though Dr. Thompson noted four separate and substantial areas that must be improved before that faculty member's Year 6 Peer Review.

81.    For example, during a Diversity, Equity, and Inclusion Committee meeting in 2021, a non-tenured male faculty member, Dr. Allen Smith, the Director of Diversity and Student Success at Kansas Wesleyan University, made comments disparaging of homosexuals (related to homosexuality being a lifestyle choice). He repeatedly interrupted and belittled four or five female faculty members who pushed back on his statements as they advocated for queer students on campus. Dr. Smith refused to acknowledge the need for more trainings and work to aid queer student needs. The Provost, Dr. Kraft, and Academic Dean, Dr. Bill Backlin, personally witnessed this non-collegial behavior toward a group of female faculty members. Dr. Smith only stopped his troubling behavior when another male faculty member spoke up and validated the comments being made by the female faculty members.

82.　　Dr. Allen Smith has also engaged in insensitive conduct towards a female faculty member surrounding Women's History Month preparation during the 2020-2021 academic school year and confronted a white, male student about his white privilege in front of a classroom full of students. The administration was made aware of these complaints. Dr. Smith remains on campus to this day.

83.　　Multiple male faculty members have been put on personal improvement plans (PIPs) with no change to their job status from the institution. At least one male faculty member was put on multiple, back-to-back PIPs with no change to his job status.

84.　　In the same academic year that Dr. Howard was non-renewed, a male faculty member made an off-hand comment during a meeting where he said something along the lines of "why is the provost [Dr. Kraft] acting bipolar in his decision making?" Another employee incorrectly reported the comment to the administration, suggesting this faculty member had actually called Dr. Kraft bipolar. Unlike the handling of accusations made about Dr. Howard's supposed non-collegiality, the administration proceeded to conduct an intensive, multi-month HR investigation. On information and belief, this investigation substantiated inappropriate behavior by the male faculty member who remains employed at KWU.

85.　　KWU retaliated against Dr. Howard for raising complaints of gender bias throughout the contract renewal process. After Dr. Howard addressed issues of gender bias, Dr. Thompson manipulated the grievance process to benefit the administration and ended her grievance refusing to follow the clearly stated actions in the Faculty Handbook. Dr. Thompson refused to follow advice and guidance from faculty in charge of the grievance.

86.　　Dr. Howard has exhausted administrative remedies to bring this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

87.     At all times relevant to the allegations herein, KWU has been a recipient of federal financial assistance and has therefore been covered by Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681 et seq.

88.     Dr. Howard's gender, female, was a motivating factor in KWU's actions described in this Complaint.

89.     KWU discriminated against Dr. Howard on the basis of her sex.

90.     KWU retaliated against Dr. Howard for engaging in activities protected by Title VII and Title IX.

91.     Dr. Howard has been damaged by KWU's illegal conduct.

92.     KWU's unlawful conduct was done willfully, intentionally, and in reckless disregard for Dr. Howard's rights.

Wherefore, Plaintiff Taryn Gilbert Howard, Ph.D., prays that judgment be entered in her favor, and against Defendant Kansas Wesleyan University, for damages in excess of $75,000.00, representing economic losses, noneconomic losses, compensatory damages, general damages, punitive damages, plus attorney's fees and costs, and all other relief that the Court deems just and equitable.

**Plaintiff Taryn Gilbert Howard, Ph.D., demands trial by jury on all issues, including the formation of any alleged arbitration agreement.**

**Plaintiff Taryn Gilbert Howard, Ph.D., designates Topeka, Kansas as the place of trial.**

Dated: June 10, 2024.

GRAYBILL & HAZLEWOOD, LLC

/s/ Sean McGivern
Sean M. McGivern, #22932
218 N. Mosley St.
Wichita, KS 67202
Telephone: (316) 266-4058
Fax: (316) 462-5566
sean@graybillhazlewood.com
*ATTORNEYS FOR PLAINTIFF*