## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| TARYN GILBERT HOWARD, PH.D., | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| | ) | |
| v. | ) | No. 24-4050-KHV |
| | ) | |
| KANSAS WESLEYAN UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM AND ORDER

On June 10, 2024, Dr. Taryn Gilbert Howard filed suit against Kansas Wesleyan University ("KWU"), alleging sex discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., and Title IX of the Education Amendments Act of 1972 ("Title IX"), 20 U.S.C. §1681 et seq. This matter comes before the Court on Defendant Kansas Wesleyan University's Motion For Summary Judgment (Doc. #63) filed June 10, 2025. For reasons stated below, the Court overrules defendant's motion.

## Summary Judgment Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Hill v. Allstate Ins. Co., 479 F.3d 735, 740 (10th Cir. 2007). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." Liberty Lobby, 477 U.S. at 248. A "genuine" factual dispute requires more than a mere scintilla of evidence in support of a party's position. Id. at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of

material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Nahno-Lopez v. Houser, 625 F.3d 1279, 1283 (10th Cir. 2010).  Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters for which the nonmoving party carries the burden of proof.  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).  To carry this burden, the nonmoving party may not rest on the pleadings but must instead set forth specific facts supported by competent evidence.  Nahno-Lopez, 625 F.3d at 1283.

In applying these standards, the Court views the factual record in the light most favorable to the party opposing the motion for summary judgment.  Dewitt v. Sw. Bell Tel. Co., 845 F.3d 1299, 1306 (10th Cir. 2018).  The Court may grant summary judgment if the nonmoving party's evidence is merely colorable or not significantly probative.  Liberty Lobby, 477 U.S. at 250–51. Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251–52.

## **Factual Background**

The following facts are undisputed or, where disputed, viewed in the light most favorable to plaintiff, the non-movant.

KWU is a private Christian university in Salina, Kansas.  In 1973, the United Methodist Church and KWU established a covenant relationship, and the church financially supports KWU. The KWU employee handbook states that "[t]he mission of Kansas Wesleyan University is to promote and integrate academic excellence, spiritual development, personal well-being, and social responsibility."  Employee Handbook (Doc. #64-1) filed June 10, 2025 at 2.  It further states that:

Kansas Wesleyan University provides a setting in which faith and learning is integrated; encounter with the Christian proclamation is an integral part of the life of the university. The university fosters the lively discussion of faith and values, encouraging students to develop a thoughtful, personal world view informed by Christian tradition.

Id.

On January 17, 2020, Dr. Taryn Gilbert Howard, who is female, applied for a position as Assistant Professor of English at KWU. Through its President, Dr. Matt Thompson, KWU hired plaintiff for the 2020–2021 academic year to teach introductory English courses to first-year students and perform other duties. KWU appointed plaintiff for one year as a probationary untenured (but tenure-track) faculty member. In March of 2021, Dr. Thompson appointed plaintiff for a second one-year term for the 2021–2022 academic year, again as a probationary tenure-track faculty member. KWU employed plaintiff for two one-year appointments.

Plaintiff's appointment letters incorporated the terms of the KWU employee and faculty handbooks. The KWU faculty handbook provided that "[a]ll contracts offered to non-tenured faculty members are for one year or less and no provision for future compensation, promotion or tenure is included or implied" and "the university may end a contract at the end of its period of appointment (normally the end of an academic year) for any reason." Faculty Handbook (Doc. #64-8) filed June 10, 2025 at 3.

Both of plaintiff's appointment letters stated that "as an employee of a religiously affiliated institution, you are required to know and embrace the KWU mission." Faculty Appointment Letter 2020-2021 Academic Year (Doc. #64-5) at 1; Faculty Reappointment Letter 2021-2022 Academic Year (Doc. #64-7) at 1. Dr. Thompson told plaintiff during her job interview, however, that she did not have to speak to or address any religious aspects of KWU's mission statement. During her employment, KWU never required plaintiff to engage in religious institution, lead prayers, mentor

-3-

over faith issues or otherwise conduct or participate in any activities of a religious nature.  To plaintiff's knowledge, KWU never referred to her as having religious or ministerial duties.  During plaintiff's employment, KWU used the Sams Chapel—a building on campus—not for worship services, but for concerts, university meetings, ceremonies and guest speakers.

KWU hired plaintiff understanding that she was assertive and passionate about social change and empowering non-dominant populations.  KWU expected that plaintiff would be an engaged and outspoken faculty member.  In fact, during her interview with Dr. Thompson, plaintiff voiced her opinion that KWU should aim to hire a more diverse candidate and work on its lack of diversity in faculty and administration.  KWU viewed plaintiff's expressed interests in social causes as a notable strength and hoped that plaintiff's personal and academic interest in this area would align with its faith-based mission because social justice—which John Wesley, founder of the Methodist movement, referred to as "social holiness"—is an integral component to KWU's United Methodist purpose.

KWU advances social holiness through its Diversity, Equity and Inclusion ("DEI") Committee, which encourages a climate of inclusion and enriches the lives of its constituents. Throughout her employment, plaintiff served on the DEI Committee.  During her second year, plaintiff co-chaired the Academic Subcommittee of the DEI Committee.

KWU expects teaching faculty of all disciplines to uphold its faith-based values and mission—which include promoting and integrating spiritual development in their work.  KWU asks its faculty to complete annual self-evaluations to assess their performance within the context of the KWU mission.  In her 2021–2022 report, plaintiff did not address faith or spiritual development, and she crossed out the phrase "spiritual development" without responding to it.  No one addressed plaintiff's failure to address the "spiritual development" category in her report.

KWU also expects faculty to attend baccalaureate ceremonies, which are worship services held before graduation. Plaintiff never attended a baccalaureate ceremony, and no one at KWU said anything about her absence.

The faculty handbook communicates an expectation that faculty members will act collegially by advocating for each other and the university as a whole and communicating directly and compassionately. <u>Faculty Handbook</u> (Doc. #64-8) at 5. In addition, the employee handbook contains a "Personal Conduct" expectation, which states that "[e]mployees are at all times expected to conduct themselves with professionalism, courtesy, and respect in their dealings with each other and students, parents, and vendors." <u>Employee Handbook</u> (Doc. #64-1) at 4.

During her second year, KWU administrators began to believe that plaintiff was being deleterious instead of collaborative with regard to the common work of the university. Administrators observed that some of plaintiff's behavior was inconsistent with the KWU mission.[1] In March of 2021, Dr. Thompson decided not to re-appoint plaintiff for a third academic year. Along with the Provost, Dr. Kraft, and the Academic Dean, Dr. Backlin, Dr. Thompson had observed problematic interactions between plaintiff and colleagues and had received feedback from other faculty expressing concerns about plaintiff's behavior and intentions toward the university. These concerns included administrators' observations and feedback from plaintiff's colleagues that her conduct was disrespectful, combative, non-collegial, intentionally divisive,

---

[1]     Plaintiff controverts this factual assertion, and a number of others, by stating that they are based on testimony or assertions of KWU President, Dr. Matt Thompson, KWU Provost, Dr. Damon Kraft and KWU Academic Dean, Dr. Bill Backlin, which the Court need not believe. Rule 56(c)(1)(A), Fed. R. Civ. P. states that "a party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of material in the record." Plaintiff has not offered any specific grounds for controverting the factual assertions, cited the record or offered contrary evidence. Thus, for the purposes of summary judgment, the Court deems these factual assertions uncontroverted.

malicious and not collaborative.  Colleagues reported that plaintiff engaged in belittling and bullying conduct and quashed other viewpoints in meetings.

Plaintiff served on the Faculty Affairs Committee.  In August of 2021, that Committee planned KWU's faculty retreat.  At the retreat, the Committee excluded Dr. Thompson, Dr. Kraft and Dr. Backlin from programming and faculty voting, even though the faculty handbook expressly included their three administrative positions (President, Provost and Academic Dean) in the "Faculty" membership which had voting rights.  Faculty Handbook (Doc. #64-8) at 2.  The Committee also excluded the three administrators from the breakout sessions for teaching faculty.

After the retreat, the three administrators met with the Faculty Affairs Committee, including plaintiff, and counseled them that excluding the three administrators from retreat activities was inappropriate and was not how KWU expected faculty to treat colleagues.  Plaintiff defended the Committee decisions, saying that she was unfamiliar with faculty retreats that included administrators.  Dr. Kraft pointed out that plaintiff was only beginning her second year in higher education and that she had a limited perspective.  The discussion lasted five minutes, and plaintiff and other members of the Committee did not perceive it as a warning or admonishment.

In the fall of 2021, Dr. Backlin heard from a faculty member that plaintiff often spoke negatively about Dr. Thompson, Dr. Kraft and Dr. Backlin, complaining that "three white men" led the university and commenting that she did not appreciate "three white men" telling her what to do.  Defendant's Answers To Plaintiff's First Set Of Interrogatories To Defendant (Doc. #64-10) at 10.  The faculty member described plaintiff's comments as "nastiness and non-specific," without tangible or articulable complaints that the administrators could address.  Id. at 4.

In the fall of 2021, at the Futures Summit meeting, plaintiff made comments about white privilege and males.  After observing that one of plaintiff's colleagues was visibly upset, Dr.

Backlin asked her to stop. Barry Weis, then Board of Trustees Chair, testified that he was in a group with plaintiff working on tasks and plaintiff made an interaction contentious and made others withdraw from participating. On the other hand, Dr. Weis testified that plaintiff did not cause tension at the Futures Summit meeting.

In October of 2021, faculty and administration disagreed over a proposed change in who could vote at faculty meetings. The administration was unhappy that the Faculty Affairs Committee had removed the librarian from the faculty proposal. On February 7, 2022, before the vote at the February Faculty Meeting, the Faculty Affairs Committee met with Dr. Thompson and Dr. Kraft to discuss the faculty proposal. Dr. Thompson and Dr. Kraft said that they did not support the faculty proposal. Plaintiff, the most junior and only non-tenured member of the Faculty Affairs Committee, acted as a Committee representative to go speak with the librarian (Megan Mack) and Director of Student Success (Bryan McCuller) to discuss the proposal.

On February 14, 2022, the Faculty Affairs Committee advanced a proposal which passed by a 38-6 vote among faculty.[2] Dr. Kathy Sweeney advised administration that "someone" on the Faculty Affairs Committee was acting with his or her own agenda, and Dr. Kraft discerned that that person must be plaintiff.

Dr. Backlin, who was also a member of the DEI Committee, reported to Dr. Kraft that plaintiff's behavior in the DEI meetings upset him. He stated that plaintiff's conduct was such that he could not continue to attend meetings, even if he would be disciplined for refusing to attend. He specifically cited treatment of Dr. Allen Smith, Director of Diversity & Student Success—

---

[2]     The proposal stated that voting membership should "consist of members who are responsible for developing and implementing curriculum and assessment within their academic programs." Plaintiff's Memorandum In Opposition (Doc. #70) filed July 7, 2025 at 13.

which Dr. Backlin described as plaintiff "really unleash[ing] on him" and "very cruel."  Deposition Of William Wayne Backlin, Ph.D. (Doc. #64-14) at 2:6, 2:14–15.  At a DEI meeting, Dr. Smith had resisted programming around sexual identity and said that homosexuality was a lifestyle choice.  Dr. Backlin shared this information with Dr. Thompson.

In early 2022, Dr. Kraft learned from the Director of Nursing Education, Janeane Houchin, that a faculty member who was on the Faculty Affairs Committee with plaintiff was struggling to stand up to plaintiff, and Ms. Houchin felt that plaintiff was a bully.  Ms. Houchin also told Dr. Kraft that plaintiff seemed to have her own agenda.[3]

In February of 2022, at the direction of Dr. Kraft, Dr. Backlin called Dr. Meredith Drees, who was a faculty member in the Humanities Division with plaintiff.  Dr. Backlin called to ask how Dr. Drees was feeling and to discuss the Wesleyan Journey, a mission program which combines academic study, travel and service missions.  During the call, Dr. Drees stated that plaintiff resisted the Wesleyan Journey program and was "belligerent, malicious and deliberate" in her attempts to drive a wedge between teaching faculty and administration during teaching meetings.  Backlin Deposition (Doc. #64-14) at 24:14.  Dr. Drees said that due to their toxic tone and promotion of things that were contrary to KWU ideals and mission, she dreaded attending meetings with plaintiff.  Dr. Drees stated that plaintiff would take charge of teaching faculty meetings and cut off others who tried to express a positive viewpoint of the administration.

In the spring, probationary tenure-track faculty undergo peer reviews at KWU.  Following

---

[3]    Plaintiff objects to this factual contention, arguing that what Ms. Houchen reported to Dr. Kraft is hearsay.  As it relates to defendant's decision not to renew plaintiff's contract, reports about plaintiff's behavior fall under the effect on the listener hearsay exception.  See United States v. Twitty, 689 F. App'x 890, 895 (10th Cir. 2017) (evidence offered to show effect on listener not hearsay).

the peer review, the Peer Review Committee and the administrative representative (either the Provost or Academic Dean) submit a strengths/weaknesses report to the President and make recommendations whether to continue the faculty member's contract.  The faculty member can submit a rejoinder (rebuttal) letter to the Divisional Council, which makes a non-binding recommendation to the President.  The President has final authority regarding appointment or non-reappointment.

On February 24, 2022, plaintiff had her second-year peer review meeting.  In the meeting, three members of the teaching faculty, her Peer Review Committee, and Dr. Kraft reviewed her performance.  As with all faculty peer reviews that year, topics included collegiality.  Most of plaintiff's review was positive.  During the last part of plaintiff's review, however, Dr. Kraft shared feedback with plaintiff which he had received—some of which very recently.  Dr. Kraft said that he had heard from plaintiff's colleagues that she was not collegial and that some colleagues viewed her as "deliberatively divisive and even with elements of malice" and operating with her own agenda instead of the faculty agenda.  <u>Declaration Of Dr. Damon Kraft</u> (Doc. #64-26), ¶ 5.  Dr. Kraft asked for plaintiff's perspective on these things.  Plaintiff disagreed and responded that the concerns were loaded and inconsistent with her perception of her collegiality.  Plaintiff stated that she had very strong opinions and believed that Dr. Kraft had raised these issues because she was an untenured professor who had ruffled administrative feathers while working on the Faculty Affairs Committee.  Plaintiff further stated as follows:

> I would say your comments were overall positive, and so it just feels strange to come to this meeting with with this sort of what feels like sort of a loaded gun, if I'm going to be honest, with you know, I have no problem talking about collegiality, I think everybody has been asked about that. But, um I am a bit uncomfortable with the one person coming to you uh, and then that being put in some sort of position here um for somebody who again from a gendered perspective or from someone who is outspoken, it feels really problematic.

Peer Review Audio Recording (Doc. #64-27) at 1:25:44–1:28:00, 1:33:38–1:34:19.

On February 25, 2022, the teaching faculty members on plaintiff's Peer Review Committee provided a letter which supported continuation of plaintiff's contract.  On March 3, 2022, however, Dr. Kraft provided a peer review letter which stated that while plaintiff had strengths as an instructor, he could not with confidence recommend continuation of her contract.  In his letter to Dr. Thompson, Dr. Kraft stated, "[plaintiff] noted that these questions I raised with her seemed problematic from a gendered perspective.  I'm unclear what she meant in this regard.  No one, myself included, has raised any concerns related to gender, nor is there any reason to believe the opinions of faculty shared with me concerning [plaintiff] have been motivated by gender bias." March 3, 2022 Letter (Doc. #64-28) at 3.

Prior to the peer review meeting on February 24, 2022, no one had mentioned collegiality concerns to plaintiff.  Plaintiff's personnel file contained nothing negative, and no one had submitted any formal or informal complaints about her.  People merely reported "concerns" which are not documented in plaintiff's personnel file.  No one complained to Human Resources about plaintiff's behavior, and no one at KWU investigated concerns about plaintiff's behavior.  Dr. Kraft testified that only formal complaints warrant investigation, and Dr. Thompson confirmed that to be investigated, concerns must rise to the level of a complaint.[4]  Except for Dr. Kraft's

---

[4]     KWU may have investigated other matters which did not rise to the level of a formal complaint.  HR conducted an investigation when Dr. Dan Botz, a tenured male faculty member, called Dr. Kraft bipolar.  Dr. Thompson does not remember whether the report about Dr. Botz was a formal complaint, but he believes that HR interviewed various individuals about the incident.  At the 2021–2022 faculty retreat, a male professor, Dr. David Silverman, had an emotional outburst, and HR asked Dr. Backlin to serve on a team to investigate this incident.  Another male employee, Dr. Allen Smith, called a student to the front of the class and talked about his white privilege.  HR did not investigate the incident, but KWU did not discipline or take action against him.

questioning in the peer review meeting, no one at KWU interviewed plaintiff or asked for her side of the story with respect to any of the stated concerns.

On March 14, 2022, as part of the peer review process, plaintiff submitted a rejoinder to the Divisional Council, where she rebutted Dr. Kraft's peer review letter.  Her eight-page, single spaced rejoinder letter did not mention sex discrimination or different treatment on account of sex. Plaintiff posited that Dr. Kraft had not supported her renewal because she was the only non-tenured faculty member on the Faculty Affairs Committee, and the administration was punishing her for "presenting issues faculty have."  Rejoinder Letter (Doc. #64-25) at 7.  Plaintiff further stated that Dr. Kraft's position "suggest[ed] [she was] being punished for individual perceptions about how Faculty Affairs works or how Teaching Faculty meetings have been run."  Id.

On March 31, 2022, Dr. Thompson sent plaintiff a letter informing her that KWU would not renew her probationary contract.[5]  In part, Dr. Thompson's letter stated:

> I have made the decision to not renew your probationary contract at the end of this current term . . . . While I recognize your success in the classroom, it is outweighed by your approach and style outside of the classroom.  As president, I lack confidence in your trustworthiness and your ability to perceive or care how you are viewed by others.  This opinion is not the result of one incident, but an accumulation of concerns, some of which have come to light recently.  I am aware of specific examples of how you have intentionally misrepresented facts/conversations and worked to be deleterious to our common work instead of being collaborative. Based on your rejoinder, you seem surprised that people do not want to work with you.  There are faculty, staff, and board members who do not want to interact with you.  Your style is counterproductive to collegiality and the best interest of the

_____

[5]    KWU renewed the contracts of male employees despite various concerns.  In the fall of 2018, KWU hired Dr. Kevin Wright as a probationary tenure-track faculty member. Following his year-four peer review, based on his teaching performance, being late for class, time prioritization and failing to submit required materials for peer review, Dr. Backlin did not recommend renewal.  Nevertheless, Dr. Thompson renewed Dr. Wright's appointment because he believed that he could improve his teaching ability.  In 2019, Dr. Kraft recommended the renewal of another male professor's contract, despite the professor's history of passionate outbreaks in communicating with students and faculty and fracturing a relationship with the Wichita Symphony.

institution.

Non-Reappointment Letter (Doc. #64-11) filed June 10, 2025.

KWU's faculty handbook contains a grievance procedure. It states that "a grievance is a claim that adverse action has been taken against a faculty member that involves the member's contractual status or the terms and conditions of employment." Faculty Handbook (Doc. #64-24) at 9. Following receipt of her notice of non-reappointment, plaintiff initiated a grievance against Dr. Thompson and Dr. Kraft.

As the first step of the grievance process, plaintiff had an informal meeting with Dr. Thompson. On April 12, 2022, Dr. Thompson, plaintiff and Phil Meckley, plaintiff's chosen advisor, attended that meeting. Plaintiff made an audio recording of the meeting. In the meeting, plaintiff contended that KWU did not renew her contract due to sex discrimination. On April 18, 2022, following the informal grievance meeting, Dr. Thompson responded to plaintiff with a letter which reiterated his reasons for nonrenewal. It stated that "[s]ince sending you the letter of non-renewal, I have also been disappointed by the way that you have involved students. As you clearly know, students are not able to speak into this process at this time. Yet, you have engaged students in this personnel matter. This re-enforces for me that I do not agree with your approach to the work of the university." April 18, 2022 Letter (Doc. #64-12) at 3.

On April 25, 2022, as part of the grievance process, plaintiff submitted a Faculty Complaint/Grievance Form. In it, she grieved Dr. Thompson's nonrenewal decision, stating:

> I believe there is absolutely no justification in my termination. I also continue to insist I should have received a contract for reappointment for the 2022-23 academic year as I excelled in all four tenants of the Peer Review process per the feedback from all three faculty members and the Provost.

Faculty Complaint/Grievance Form (Doc. #64-31) at 2. She also accused Dr. Thompson of "rumor

mongering" regarding the perceptions of her collegiality.  Id.  As a result of plaintiff initiating the grievance process, KWU formed a Grievance Committee.  On May 2, 2022, Dr. Thompson delivered a letter to the Grievance Committee which explained that because nonrenewal of plaintiff's contract did not impact her status, rights or the terms of her contract, plaintiff did not have a grievance under the faculty handbook definition.[6]  On May 12, 2022, after considering plaintiff's written grievance and Dr. Thompson's letter, the Grievance Committee issued a report which found that the preponderance of the evidence did not support plaintiff's allegations of gender bias.  The Grievance Committee did not address whether plaintiff had a grievance under the faculty handbook definition.

Dr. Thompson determined that because he would be both the respondent and the decisionmaker following such hearing, a grievance hearing would be illogical.  Instead, Dr. Thompson decided that plaintiff should present her grievance to the Executive Committee of the Board of Trustees.  On June 7, 2022, plaintiff submitted a letter to the Executive Committee of the Board of Trustees.  Her letter argued that KWU should not have considered collegiality in peer review and reappointment decisions; complained that Dr. Thompson's letter of March 3, 2022 "made broad statements about [her] 'likability' and 'style'" and accused Dr. Thompson of "rumor mongering" about her "supposed 'likability' and 'non-collegiality.'"  June 7, 2022 Letter (Doc. #64-34) at 3.  Plaintiff accused the President and Provost of fabricating collegiality concerns from fellow faculty.  Plaintiff also asserted that her nonrenewal was retaliation for her work on the Faculty Affairs Committee, stated that she was the best person for the teaching job, even against a

---

[6]    The faculty handbook states that "a grievance is a claim that adverse action has been taken against a faculty member that involves the member's contractual status or the terms and conditions of employment."  Faculty Handbook (Doc. #64-24) at 9.

new pool of candidates, and stated that she deserved to be at KWU.

During her deposition, defense counsel asked plaintiff to clarify what "sexism" she experienced while employed at KWU. She responded that (1) Dr. Kraft would roll his eyes when he spoke to her, (2) she felt like Dr. Kraft belittled the English department and its faculty, (3) Dr. Kraft did not seem to hold female faculty to the same account as male faculty and (4) "it was just a general demeanor with [Dr. Kraft]." Id. at 345:15–356:8. Prior to her peer review meeting on February 24, 2022, however, plaintiff did not complain about sexism.

In her deposition, defense counsel also asked plaintiff whether she could acknowledge that some of her colleagues may have found her conduct to be bullying or rude. Plaintiff responded, "Hypothetically, I'm sure that some people may not like me. I don't know that I can point to activity directly that would be bullying or rude. I don't know." Deposition of Taryn Gilbert Howard, Ph.D (Doc. #64-6) at 299:12–19.

On June 20, 2022, the Executive Committee reviewed plaintiff's grievance record and issued a unanimous decision. It determined that plaintiff could not grieve the nonrenewal decision because it was not "adverse action" within the meaning of the faculty handbook and that even if nonrenewal decisions could be grieved, the decision was not arbitrary. The Executive Committee's decision letter stated, "Dr. Thompson's stated reasons for the decision, though they are unsatisfactory to you, are nonetheless legitimate and appropriate reasons for such a decision. The Executive Committee further disagrees with you that any Handbook policy was violated in reaching the decision not to reappoint you." June 20, 2022 Letter (Doc. #64-35) at 2.

During the peer review and grievance processes, plaintiff was not conciliatory upon learning that others viewed her behavior as problematic; rather, she went on the offensive and repeatedly accused the President and Provost of fabricating concerns. In Dr. Thompson's view,

plaintiff's grievance materials—in which she intended to make the case for reappointment—demonstrated further unprofessional, untruthful and inappropriate conduct.

Acting through Dr. Thompson, KWU hired a woman, Dr. Barbara Brown, to replace Dr. Howard for the semester after the nonrenewal of plaintiff's contract.

<u>Analysis</u>

Plaintiff asserts sex discrimination and retaliation in violation of Title VII and Title IX. Specifically, plaintiff alleges that defendant discriminated and retaliated against her "from the initial recommendation of nonrenewal through the final decision confirming her nonrenewal, and by denying her a grievance hearing." <u>Pretrial Order</u> (Doc. #60) filed May 20, 2025 at 20–21. Defendant seeks summary judgment, arguing that (1) the ministerial exception bars plaintiff's claims, (2) plaintiff cannot establish sex discrimination under Title VII or Title IX and (3) plaintiff cannot establish retaliation under Title VII or Title IX. <u>See</u> <u>Defendant Kansas Wesleyan University's Memorandum In Support Of Its Motion For Summary Judgment</u> (Doc. #64) filed June 10, 2025.

**I.      Whether The Ministerial Exception Bars Plaintiff's Claims**

Under the ministerial exception, courts must "stay out of employment disputes involving those holding certain important positions with churches and other religious institutions." <u>Our Lady of Guadalupe Sch. v. Morrissey-Berru</u>, 591 U.S. 732, 746 (2020). As the name suggests, the exception only precludes employment discrimination claims which a "minister" brings against her religious employer, so the threshold determination is whether plaintiff was a minister. <u>Tucker v. Faith Bible Chapel Int'l</u>, 36 F.4th 1021, 1029 (10th Cir. 2022). The Supreme Court has declined to "adopt a rigid formula for deciding when an employee qualifies as a minister." <u>Our Lady</u>, 591 U.S. at 746 (quoting <u>Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.</u>, 565 U.S.

171, 190 (2012)).  Determining whether an employee is a minister requires a fact-intensive inquiry into the specific circumstances of the case.  Tucker, 36 F.4th at 1029.  Courts consider such factors as the employee's title and primary duties, whether the employer held out the employee as a minister, whether the employee held herself out as a minister, whether the employee played an important role in transmitting faith and whether the employee received religious training.  See Hosanna-Tabor, 565 U.S. at 191.

Defendant argues that plaintiff was a minister because (1) her employment letters required her to know and embrace KWU's mission, which includes promoting spiritual development and social responsibility, (2) KWU's Statement of Connection requires all faculty members to prepare students for lives of spiritual fulfillment and openly affirm the relationship between the United Methodist Church and KWU, (3) in their Faculty Annual Reports, KWU asks faculty members to explain their strengths and weaknesses in furthering the mission, (4) KWU charged plaintiff with duties vital to achieving its faith-centric purpose, (5) plaintiff taught introductory courses and was one of students' earliest connections to KWU's mission of spiritual development and social responsibility, (6) plaintiff integrated religious discussions into her classes, (7) KWU expected plaintiff to attend religious events and participate in prayer in meetings and (8) plaintiff held leadership positions on the Faculty Affairs Committee and sat on the DEI Committee, which is a particularly important role in the United Methodist denomination.

Plaintiff argues that she was not a minister because (1) during her job interview, Dr. Thompson told her that she did not have to speak to or address any religious aspects of the KWU mission statement, (2) KWU never required plaintiff to engage in religious institution, lead prayers, mentor over faith issues or otherwise conduct or participate in any activities of a religious nature, (3) KWU never referred to plaintiff as having religious or ministerial duties, (4) no one

expressed concern that in her annual report, plaintiff crossed out the phrase "spiritual development" and did not respond to that issue, (5) no one addressed the fact that plaintiff never attended a baccalaureate ceremony and (6) during her employment, KWU used the Sams Chapel not for worship services but for concerts, university meetings, ceremonies and guest speakers.

The record reveals a genuine issue of material fact whether plaintiff was a minister. Accordingly, the Court overrules defendant's motion for summary judgment on its defense that the ministerial exception bars plaintiff's claims.

## II.    Whether Plaintiff Can Establish A Claim For Sex Discrimination

Plaintiff asserts that in violation of Title VII and Title IX, defendant discriminated against her based on sex by (1) initially recommending nonrenewal of her contract, (2) confirming the nonrenewal and (3) denying her a grievance hearing.  Defendant seeks summary judgment, arguing that plaintiff cannot establish a prima facie case of sex discrimination or show that its legitimate nondiscriminatory reasons were pretextual.

Generally, courts address Title IX discrimination claims under the same legal analysis as Title VII claims.  Throupe v. Univ. of Denver, 988 F.3d 1243, 1251 (10th Cir. 2021).  To establish a prima facie case of sex discrimination under Title VII, plaintiff must show that (1) she is a member of a protected class; (2) she was qualified for her position; (3) she suffered some harm with respect to an identifiable term or condition of employment; and (4) defendant treated her less favorably than others not in her protected class.  Muldrow v. City of St. Louis, Mo., 601 U.S. 346, 355 (2024); McNellis v. Douglas Cnty. Sch. Dist., 116 F.4th 1122, 1139 (10th Cir. 2024).  Plaintiff must show that her sex is the "but for" cause of the harm.  Bostock v. Clayton Cnty., Ga., 590 U.S. 644, 661 (2020).  After plaintiff presents a prima facie case of discrimination, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions, and finally shifts

back to plaintiff to show that the employer's articulated reasons are pretextual.  Walkingstick Dixon v. Okla. ex rel. Reg'l Univ. Sys. of Okla. Bd. of Regents, 125 F.4th 1321, 1334 (10th Cir. 2025) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)).

      A.     Whether Plaintiff Can Establish A Prima Facie Case Of Sex Discrimination

Defendant does not contest that plaintiff is a member of a protected class and was qualified for her position.  Defendant argues, however, that as a matter of law, plaintiff cannot establish a prima facie case of sex discrimination because she did not suffer adverse action, and the circumstances of the purported adverse action do not give rise to an inference of discrimination.

      **1.     Whether Plaintiff Can Establish Some Harm To A Term Or Condition Of Her Employment**

In 2024, in Muldrow, the Supreme Court altered the Title VII landscape by holding that when plaintiffs bring suit under Title VII's discrimination prong, they need not show that harm was "significant" or "any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar."  Muldrow, 601 U.S. at 355.  Instead, to establish adverse action, plaintiffs need only show "some harm" or "some disadvantageous change" with respect to an identifiable term or condition of employment.  Id. at 354–55.  Muldrow held that Title VII's anti-discrimination provision simply "seeks a workplace where individuals are not discriminated against" because of traits such as sex, and "thus flatly prevent[s] injury to individuals based on status, without distinguishing between significant and less significant harms."  Id. at 358 (internal citations omitted).

By the time the Supreme Court decided Muldrow, the term "adverse employment action" had become a term of art.  That term, and the cases which interpreted it, are not particularly helpful in the post-Muldrow environment.  Here, for some reason, the parties do not address Muldrow.  In

-18-

fact, they tee up the issues as if <u>Muldrow</u> had never been decided.  Since <u>Muldrow</u>, several federal and state courts, both district and appellate, in this judicial district and elsewhere, have addressed the new standard of adverse employment action for Title VII discrimination claims.

Defendant argues that plaintiff's nonrenewal was not adverse action because her contract and the faculty handbook expressly disclaimed any right to future employment.  Even under pre-<u>Muldrow</u> case law, this argument is without merit.  KWU's failure to reappoint plaintiff for a third one-year contract obviously constituted a harm or disadvantageous change with respect to her employment.  <u>See</u> <u>Cole v. Ruidoso Mun. Sch.</u>, 43 F.3d 1373, 1380 (10th Cir. 1994) (decision not to renew employee's contract adverse action); <u>Minshall v. McGraw Hill Broad. Co.</u>, 323 F.3d 1273, 1280 (10th Cir. 2003) (failure to renew employee contract adverse action under ADA); <u>Wilkerson v. New Media Tech. Charter Sch. Inc.</u>, 522 F.3d 315, 320 (3d Cir. 2008) (failure to renew employment arrangement for limited period of time adverse action if done for reason Title VII prohibits; failure to rehire can constitute adverse employment action).

Defendant has not established (or even argued) that it is entitled to judgment as a matter of law on the issue of adverse employment action under <u>Muldrow</u>.[7]  The Court therefore overrules defendant's motion for summary judgment on this ground.

### 2. Whether Plaintiff Can Establish That Defendant Treated Her Differently

Defendant argues that the circumstances of the purported adverse action do not

---

[7]    Defendant also argues that Dr. Kraft's consideration of collegiality in plaintiff's peer review, his comments to her, his peer review letter and his recommendation do not constitute adverse action because they do not create a significant change in employment status.  Again, defendant cites only pre-<u>Muldow</u> law and has not established as a matter of law that Dr. Kraft's actions did not cause plaintiff to suffer some harm or a disadvantageous change to a term or condition of her employment.

give rise to an inference of discrimination. Specifically, defendant argues that the decision not to renew plaintiff's appointment was not motivated by discriminatory animus because (1) Dr. Thompson is the same individual who hired plaintiff on two occasions, (2) Dr. Thompson made no remarks suggesting discriminatory animus toward plaintiff based on sex and (3) Dr. Thompson did not treat similarly situated men more favorably than plaintiff.

Plaintiff argues that KWU decided not to renew her employment because of sex because (1) years ago, Dr. Thompson received counseling on how to work with female colleagues, but he does not remember what he learned, (2) Dr. Kraft admitted that he had not fully read the KWU equal employment policy and took a long time to answer whether the policy prohibited gender discrimination, (3) KWU investigated when someone accused Dr. Kraft of having a mental illness, (4) KWU had only a conversation with a male employee who called student to front of class and talked about student's privilege, (5) KWU never investigated plaintiff's side of the story and (6) KWU's administration admitted that it had issues with treating female faculty different than male faculty.

As discussed, the parties do not brief the elements of plaintiff's prima facie case under Muldrow. Even so, plaintiff has presented the following evidence that defendant treated her less favorably than males: (1) KWU did not discipline or take action against a male professor when he called a student to the front of the class and talked about his privilege, (2) KWU investigated when a male professor accused Dr. Kraft of having mental illness but did not investigate the complaints against plaintiff, (3) KWU investigated when a male professor had an outburst but did not investigate the complaints against plaintiff, (4) Dr. Thompson renewed a male professor even though Dr. Backlin did not recommend his renewal based on his teaching performance and (5) Dr. Kraft recommended renewal of a male professor despite a history of passionate outbreaks in

communicating with students and faculty and a fractured relationship with the Wichita Symphony. While these situations are not identical to plaintiff's circumstances, plaintiff has presented evidence of discrepancies between how KWU treated plaintiff and how it treated males. Further, plaintiff's colleagues on her Peer Review Committee supported renewal of her contract—only Dr. Kraft mentioned concerns about her collegiality and did not support renewal of her contract.

The Court acknowledges that KWU hired a woman to replace plaintiff. Title VII prohibits, however, discriminatory treatment based on an employee's failure to fulfill traditional sex stereotypes. See Bostock, 590 U.S. at 662. Plaintiff claims that KWU considered collegiality and did not renew her contract because she is an *outspoken* woman. Thus, the fact that KWU hired a woman replacement is not dispositive.

The record reveals a genuine issue of material fact whether, in light of Muldrow, defendant treated plaintiff less favorably than male employees. Accordingly, the Court overrules defendant's motion for summary judgment on the ground that plaintiff cannot establish a prima facie case of sex discrimination.

B.     Whether Plaintiff Can Establish Pretext

For purposes of summary judgment, plaintiff has set forth a prima facie case of discrimination. The burden therefore shifts to defendant to proffer a legitimate, non-discriminatory reason for its decision. Defendant claims that it did not reappoint plaintiff because (1) she was disrespectful and non-collegial in dealing with teaching faculty and administrators, (2) some of her colleagues dreaded and avoided attending teaching and committee meetings with her, (3) she misrepresented facts relating to a voting matter and (4) some of her colleagues

considered her to be malicious and a bully.[8]

Because defendants have offered non-discriminatory reasons, plaintiff must establish that defendant's offered legitimate reasons were not the true reasons for its decision but rather were pretext.  See Trujillo v. PacifiCorp, 524 F.3d 1149, 1154–55 (10th Cir. 2008).  To defeat summary judgment, plaintiff's burden is only to demonstrate a genuine issue of material fact whether the proffered reasons are unworthy of belief.  Id. at 1158.  Plaintiff can show pretext by weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its action such that a reasonable factfinder could rationally find them unworthy of credence and infer that the employer did not act for the asserted non-discriminatory reasons.  Walkingstick Dixon, 125 F.4th at 1337.

Here, plaintiff argues that defendant's stated reasons were pretextual.  The record reveals that (1) no one made a formal or informal complaint to HR about plaintiff, (2) all three faculty members on plaintiff's Peer Review Committee recommended renewal of her contract, (3) no one mentioned any complaints or issues to plaintiff until her peer review meeting, (4) various discrepancies exist between how KWU treated plaintiff and male employees, (5) KWU never investigated the concerns against plaintiff and (6) except during her peer review meeting, KWU did not get plaintiff's side of the story before deciding not to renew her appointment.  On this record, a reasonable factfinder could find that defendant's proffered reasons for not renewing plaintiff's contract are unworthy of belief.

The record reveals a genuine issue of material fact whether defendant's proffered reasons for not reappointing plaintiff were pretextual.  Accordingly, the Court overrules defendant's

---

[8]    Defendant further claims that plaintiff's conduct following the nonrenewal decision reinforced KWU's decision not to reappoint her, but even if true, this point is irrelevant.

motion for summary judgment on plaintiff's sex discrimination claims.

### III.     Whether Plaintiff Can Establish A Claim For Retaliation

Both Title VII and Title IX prohibit retaliation against individuals because they have complained of or opposed sex discrimination.  Hiatt v. Colorado Seminary, 858 F.3d 1307, 1315 (10th Cir. 2017).  As mentioned above, courts generally assess Title IX discrimination claims under the same legal analysis as Title VII claims.  Throupe, 988 F.3d at 1251.

Where plaintiff seeks to establish a Title VII retaliation claim through indirect or circumstantial evidence, the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) applies.  Pinkerton v. Colo. Dep't of Transp., 563 F.3d 1052, 1064 (10th Cir. 2009).  Once plaintiff has demonstrated a prima facie case, the burden shifts to defendant to "articulate a legitimate, nondiscriminatory reason for the adverse employment action."  Meiners v. Univ. of Kan., 359 F.3d 1222, 1229 (10th Cir. 2004).  If defendant articulates legitimate reasons for the action, then plaintiff must demonstrate that the asserted reasons were pretextual.  Id.

To establish a prima facie case of retaliation, plaintiff must demonstrate that (1) she engaged in protected opposition to discrimination; (2) she suffered adverse employment action which would dissuade a reasonable worker from making or supporting a charge of discrimination; and (3) a causal connection exists between her protected activity and the adverse action.  See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006); Fassbender v. Correct Care Sols., LLC, 890 F.3d 875, 890 (10th Cir. 2018); Johnson v. Unified Sch. Dist. 507, Haskell Cnty., Kansas, 580 F. Supp. 3d 999, 1006 (D. Kan. 2022) (to state claim for Title IX retaliation, plaintiff must show that she engaged in protected activity, employer took adverse employment action against her and employer took adverse action because of her protected activity).

Defendant argues that plaintiff (1) did not engage in protected opposition or activity prior

to her nonrenewal, (2) cannot show a causal connection and (3) cannot show that KWU's legitimate non-retaliatory reasons for not renewing her contract were pretextual.

      A.      <u>Whether Plaintiff Can Establish That She Engaged In Protected Activity</u>

Under Title VII, protected activity "includes either (1) participating in or initiating a Title VII proceeding or (2) opposing discrimination made unlawful by Title VII." <u>Boese v. Fort Hays State Univ.</u>, 814 F. Supp. 2d 1138, 1146 (D. Kan. 2011), <u>aff'd</u>, 462 F. App'x 797 (10th Cir. 2012). Plaintiff need not show that she reported an actual Title VII violation, as long as she can show a "reasonable good-faith belief that she was opposing discrimination." <u>Fassbender</u>, 890 F.3d at 890. Under Title IX, reporting or speaking out about sex discrimination is protected activity. <u>Jackson v. Birmingham Bd. of Educ.</u>, 544 U.S. 167, 179 (2005).

Defendant argues that plaintiff did not engage in protected activity because (1) plaintiff complained of sex discrimination for the first time during her informal meeting with Dr. Thompson, which occurred after KWU decided not to reappoint her, (2) plaintiff did not mention sex discrimination in her rejoinder letter and (3) plaintiff made only one vague, singular mention of gender during her peer review meeting.

Plaintiff argues that she engaged in protected activity because (1) during her peer review meeting, she objected to Dr. Kraft's questioning about collegiality based on gender and being an outspoken woman, and (2) Dr. Kraft recognized that plaintiff had made a discrimination complaint because he denied gender bias in his nonrenewal recommendation.

The record reflects that on February 24, 2022, during her peer review meeting, plaintiff stated that she was "a bit uncomfortable" with Dr. Kraft bringing up collegiality issues based on what one person had told him and stated that "from a gendered perspective or from someone who is outspoken, it feels really problematic." Plaintiff opposed Dr. Kraft's questioning on the basis

of sex.  The fact that Dr. Kraft's nonrenewal letter denied gender bias suggests that he understood plaintiff's comment to be opposing gender discrimination, which is unlawful under Title VII and Title IX.  See Pearson v. Kansas Dep't of Corr., No. 23-2288-DDC, 2024 WL 4948884, at *15 (D. Kan. Dec. 3, 2024) (no protected activity because plaintiff failed to put defendant on notice that she was complaining about discrimination).

The record reflects a genuine issue of material fact whether plaintiff engaged in protected activity.  Accordingly, the Court overrules defendant's motion for summary judgment on this ground.

B.    Whether Plaintiff Can Establish A Causal Connection

Defendant argues that plaintiff cannot establish a causal connection because she first complained of sex discrimination after KWU decided not to renew her contract.

Plaintiff may show a causal connection by "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." Burrus v. United Tel. Co. of Kan., Inc., 683 F.2d 339, 343 (10th Cir. 1982).  Generally, "if the adverse action occurs in a brief period up to one and a half months after the protected activity, temporal proximity alone will be sufficient to establish the requisite causal inference." Conroy v. Vilsack, 707 F.3d 1163, 1181 (10th Cir. 2013).

As noted, a genuine issue of material fact exits whether plaintiff's resistance to Dr. Kraft's line of questioning during her peer review based on gender constituted protected activity. Plaintiff's peer review took place on February 24, 2022, and on March 3, 2022, less than two weeks later, Dr. Kraft recommended that KWU not renew her contract.

Plaintiff has established a genuine issue of material fact as to causation and a prima facie retaliation case.  Accordingly, the Court overrules defendant's motion for summary judgment on

this ground.

C.     Whether Plaintiff Can Establish Pretext

Defendant argues that even if plaintiff can establish a prima facie case of retaliation, she cannot prove that its legitimate non-discriminatory reasons for not renewing her contract were pretextual.  As noted above, defendant claims that it did not reappoint plaintiff because (1) she was disrespectful and non-collegial in dealing with teaching faculty and administrators, (2) some colleagues dreaded and avoided attending meetings with her, (3) she misrepresented facts relating to a voting matter and (4) some colleagues considered plaintiff to be malicious and a bully.

As discussed above, the record reflects that (1) no one formally or informally complained to HR about plaintiff, (2) everyone on plaintiff's Peer Review Committee recommended renewal of her contract, (3) no one mentioned any complaints or issues to plaintiff until her peer review meeting on February 24, 2022, (4) various discrepancies exist between how KWU treated plaintiff and male employees and (5) until her peer review meeting, KWU never investigated the concerns against plaintiff or got her side of the story.  Based on this evidence, a reasonable factfinder could find that defendant's proffered reasons for not renewing plaintiff's contract are unworthy of belief.

The record reflects a genuine issue of material fact whether defendant's proffered reasons for not reappointing plaintiff were pretextual.  Accordingly, the Court overrules defendant's motion for summary judgment on plaintiff's retaliation claims.

**IT IS THEREFORE ORDERED** that Defendant Kansas Wesleyan University's Motion For Summary Judgment (Doc. #63) filed June 10, 2025 is **OVERRULED.**

Dated this 14th day of August, 2025 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge

-26-